Okay, Mr. Alexander. Good morning, Your Honor. May it please the Court, I'd like to reserve two minutes for rebuttal, if I may. Thank you. Article 3 of the contract between the AFM and Paramount has the purpose of preserving and forbidding the offshoring of the musical scoring of motion pictures produced by signatory producers like Paramount. The question in this case is how to interpret and apply the term produced when there are two production companies involved in making a motion picture, and whether on the evidence in the record it's appropriate to say that a jury could not find as a matter of law that Paramount Can I just ask a little detail? There was Paramount, there was whatever it's called. Skodan, I believe. What? Skodan, I think they called it. Skodan. And then there was this person, Mary Parent. Was she another producer? Mary Parent was the head of a production company called Disruption. Right. So what's their role in all this? Disruption is a company, and Mary Parent is an individual producer that had an exclusive producing relationship with Paramount at the time that the movie was being made. But apparently it wasn't exclusive, and that's part of the – but I'm just asking – you started by saying there were two production companies, and I'm asking, weren't there really three? Not for purposes of determining who produced the motion picture, because the Disruption production company acted operationally. Mary Parent was acting, assigned by Paramount to be the on-the-ground lead producer. Your Honor, Judge Berzon, in fact the agreement between Paramount and Disruption, which is Mary Parent's company, expressly states that exclusivity of her producing work is of the essence of that contract, and the only opportunity she could produce outside of working as a producer for Paramount is if Paramount rejected a motion picture in a third party that employed her, paid back to Paramount the overhead money that Paramount paid for the purpose of keeping her as an exclusive Paramount producer. So in this case, Disruption acted, we think a jury could find, as the eyes and ears of Paramount making the movie on the ground. For purposes of interpreting and applying this work preservation provision, the common sense notion and the industry notion of producing being synonymous with making and creating a motion picture doesn't change whether it's a single producer or two producers making the motion picture. The important aspect is whether the signatory producer had the ability and the control and took the actions that are consistent with the creative and financial interest and control in making a motion picture. And the reason for that is that the whole purpose of Article 3 is to preserve work for American musicians to score motion pictures when the signatory producers are acting in the fashion of making a motion picture with the creative role and the financial role that they do. It doesn't change because there are two production companies that are making the motion picture. So is your position that there was an issue of fact about who was really the producer or that she should have been able to determine that as a matter of law? We believe that there's a question of fact that you could not make a decision as a matter of law, well, who produced the motion picture. It's clear as a matter of law that Paramount was a producer under the collective bargaining agreement. That's not disputed. What is disputed is whether Paramount's activities and relationship to the motion picture and control over the motion picture was such that they can be deemed to have produced it under Article 3. And our position is that the evidence in the record absolutely provides more than enough basis for a jury to determine that Paramount did, in fact, take the actions and acted as a producer that produced the motion picture, which is called the same kind of different as me. Everyone calls it SCODAM. So what is your understanding of the ruling is that the district court seemed to say that it was a producer insofar as what it did, but it wasn't for purposes of Article 3 because it didn't have employees? Yes. I think if I — It didn't have employees or it couldn't have had employees or it didn't have control over the employees? What exactly? Our understanding of what the district court's opinion stated, because this was not actually argued in this way to the court, is that although there is evidence in the record that Paramount did, in fact, produce the motion picture as that term is used, as it interpreted that term under Article 3, in order for Article 3 to preserve the work for American musicians, Paramount had to, in fact, be the employer of the musicians that scored the work. An employer of somebody. Well, under the court's ruling — No. The employer of the folks who scored the film. As well as the — So that's why I don't understand, counsel. Let me just — because your time is ticking, if I can cut to the chase. Sure. I don't understand why you're arguing to us about issues of fact about whether Paramount did or did not produce the film, because I read the order the way I think Judge Berzon does, that the district court decided in any of it, even if Paramount was the producer, there's this problem because Paramount didn't employ the musicians, right? Let me turn to that. So a remand on whether or not Paramount was a producer isn't going to get you anywhere. It's this other issue that's the nub of your problem, isn't it? Yes. And just quickly related to that, because you spent a fair amount of time in your opening brief asking us to take a broader view of what was a producer, and I don't understand why that has any impact on this case. And you sort of said that in your reply brief. So should we just forget all that for now? I think it's appropriate, because if you — unless you disagree with the district court's finding that there was sufficient evidence for a jury to find that Paramount produced the film. So let's just assume you're right. Okay. Let's assume you're right, and then Paramount was the producer. Then let's get to your problem. Yes. Okay. Turning to the reason the district court's interpretation of Article III is wrong is that it relied entirely on looking at Articles I and II. Interpretation of what? Producer or employer? What are you talking about? We're talking about its interpretation of the application of Article III as a whole, whether or not they can be required to score the motion picture in the United States under the contract. Well, no, no, no. But the district court, I think, said both. One, Paramount was not the producer. And besides that, it's not the employer. Right? I don't believe so, Your Honor. Your Honor, because it's undisputed that the term producer, which is a capital P, is the signatories to the contract. So as a matter of law, no one disputes that Paramount is a producer under the collective bargaining agreement. But let's say there's a question of fact about the actions Paramount took on this project. Yes. And I'm giving you that. I'm saying if you win, right, assuming that Paramount was the producer on this project, not just the capital P producer, then the district court, right, applied this other problem, which said that Paramount didn't employ the musicians. And that's what this verse I'm trying to get you to focus on. Right. And the reason that that is not a proper interpretation of Article III is because the whole purpose of Article III is to require Paramount to employ the musicians when it otherwise would not do so. Or to employ them or to see that they're employed in accordance with the agreement. Do they have to actually be the employer? Under the odd relationship in the motion picture industry, the pool of available musicians is the bargaining unit. And the scoring is done through a bunch of intermediaries who are the direct supervisors. Right. So presumably it's not a question of them employing them. It's a question of them seeing that whoever employs them follows this requirement, i.e. Right. And Article III requires Paramount to take such actions to do so. So your position is they can't subcontract their way out of this agreement, right, by subcontracting, delegating, essentially, the duty to employ the musicians? Well, they can only do it under the terms of the subcontracting provision in the contract, but that's not what's at issue in this case. Right, right, right. So it's the interpretation and the basis for the district court's interpretation that makes no sense. It relies on Articles I and II, which only talks about employment of musicians, and then leaps from there to determine first that Paramount has to be the employer of the musicians in order to be required to be the employer of the musicians, which makes no sense. I think I understand your argument. And the second part is that the district court relies entirely on those same two provisions to say they also, Paramount also has to be the employer of the cast and the crew, which has nothing to do with this collective bargaining agreement. And so you cannot draw an interpretation of Article III from Articles I and II to require Paramount to be the employer of the cast and crew, especially since there's a lot of evidence in the record that you can produce a motion picture. And, in fact, the district court looked at some of that and agreed with us on that, that you can produce a motion picture without directly employing the persons on the ground making the decision. I was going to ask if you want to speak to the affirmative defense, but am I changing the subject to a question? A little bit. Okay. We can get to that. But I'm still a little baffled by the fact that Articles I and II do define the class or the bargaining unit as musicians employed by the producer, right? And I understand your construction of Article III, which does get directly to the affirmative defense in a way because it means it your contention is that this is a work preservation agreement to see that they don't contract away the employees. But the mysterious part to me, and I understand that this has to do with the way the musicians employed by the producer are not, in fact, employed by the producer in the usual sense of the word employed, right? That's true as a literal technical matter, and that was something that was addressed by the NLRB in 1959 to deal with this specific industry in the independent producer case in which it held that notwithstanding that the employment of recording musicians is episodic and they work for various employers at various times on various movies, that the bargaining unit includes all of the professional recording musicians who are available to make those recordings and that whether or not they're employed through a subcontractor or a composer, they become the employees of the producer under the agreement. Did you cite that case someplace in the briefs? Yes, we do, Your Honor. It's independent motion picture producers. And if you like, I can give you the… Okay, well, I'll find it. Go ahead. It's 123 NLRB 1942. It's a 1959 case, and the industry has operated under that same relationship ever since 1959. If I could turn briefly to the 8E issue. And let me tell both of you that we'll give you some extra time in this case. It's a little sparse, so I assume you have an extra five minutes from what we said, okay? Thank you very much, Your Honor. Turning to the 8E defense, the question becomes, well, first, whether or not this is legitimate work preservation that's contract provision that's being enforced. And we think that there's actually no reasonable dispute about that because… Well, if we agree with your contract interpretation. Right. I mean, they basically are dovetails. If you disagree with my contract interpretation, then the Article III doesn't apply because Article III only applies to motion pictures produced. We don't get to the affirmative defense. But if we agree with it, that is that there is a requirement that the producer in some sense be the employer, then it's a work preservation agreement because it's to some degree that it depends on control factors, though. So there is a factual question, I guess, for both purposes. There is a factual question, Your Honor. And under the both Supreme Court and court of appeals law, the work preservation and the primary employer that the union is trying to enforce a contract against is trying to preserve work for the bargaining unit. It doesn't have to be specifically for that specific employer. And we've cited cases in our brief that go to that, including the American President Lyons case, which is the Ninth Circuit case that Judge Tashima was on. And I think the Supreme Court ILA-1 case states that specifically because in some of these cases, you're dealing with industry-wide collective bargaining agreements with many employers, and the question is whether a union trying to steer employment to members of its bargaining unit, even if it is by enforcing a contract against an employer in the industry agreement, even though it wouldn't be that employer's employees, is a legitimate work preservation provision that can be enforced, notwithstanding 8e, and the courts uniformly say that it can. The question then does become what sort of ability did Paramount have to have the scoring work assigned to American musicians under the terms of the contract? And we believe that the evidence in the record is... Which contract now? Not the collective bargaining agreement, but the contracts governing this project, right? Well, it would end up being a contract for this project, but it would be required under the collective bargaining agreement. They would be enforcing the collective bargaining agreement. We're just asking which contract you were referring to. I'm sorry. It's not a trick question. I meant that... The contract for this project, right? No. It would be enforcing the collective bargaining agreement to require Paramount to assign the work to union musicians through a contract for this project. That's what we're saying. Yes, you're right, Judge Kristin. I'm sorry. That's all right. And I think the place to say... And suppose that do you have a construction of the contracts for this project that preserved that control, or are you saying that they impermissibly gave it away? I believe that they did not give it away at all. I think that the interpretation of the contract between Paramount and SCODAM in the first instance reserved to Paramount all sorts of control over the assignment of all sorts of work, starting with... Including the choice of the composer. Absolutely. And Paramount easily could have insisted that the composer that is chosen for this work be one that assigns the musicians in the United States. That would not be an impermissible construction of the contract, and it would not be in violation of 8E. So once you get beyond that, there's other evidence in the record that Paramount, in addition to requiring that Mary Parent be assigned in her contract itself, gave her creative rights to assignment. And the composer and the composing of a motion picture is part of the creative rights. And in that case, in her contract, if Mary Parent, who has an agreement in affiliation with Paramount, disagrees with SCODAM Films on a creative matter, Paramount has the tie-breaking vote. So that's an additional piece of evidence that a jury could find that Paramount had as much authority as it wanted to have to have the work assigned. And there are we've cited cases in the record, including the D.C. Circuit case of California Carthage, in which the Court said you can't just look at the literal contractual rights. You have to look. That's not the end of the inquiry under 8E. You can look at whether, in fact, the party had the ability to have the work assigned under the terms of the contract.  Kagan. I didn't understand that point. You just told us that the little contractual rights support your position, so I didn't understand why you were trying to go beyond them. Well, I think that they do, but I also think that to the extent my friend is going to argue they didn't exercise those rights, they gave them away, I don't think that that ends the inquiry, just because they didn't exercise them in this case. I see that my time has gone way over. Thank you. No, but I did say you could go over, but I think you're going over, you're over, so thank you. We'll give you a couple minutes in rebuttal. Thank you. But we can put 20 minutes on the clock now just for clarity. Okay. Good morning, Your Honors. May it please the Court. This is a labor contract. Employment matters. I'll tell you why employment matters. First of all, under Article III, for a signatory to have any obligation to score in the United States or Canada, it must be producing the picture. Counsel, can I interrupt? Forgive me, but I just want to be clear. Is the rationale the district court relied on, am I right, that it's rationale that Paramount did not argue in the district court? You didn't advance this argument that she relied on? Is that right? Well, I don't necessarily agree with that, Your Honor. Really? Can you point to me in the record where you did advance it? Because for me, it feels — I just want to be candid so you have a chance to respond. It feels to me like my sense is that Paramount has shifted its position in this litigation. No, Your Honor. In our brief, and I could find the citation to our brief in the record, that's where we presented our arguments, the summary judgment motion in the reply brief. We had argued that in order for Paramount to be producing a picture, it must employ — employ the crew. And we also argued — Well, is that — I mean, is that because of some oddity about this — of the collective bargaining agreement, or is it an interpretation of the word produced? Because it's a very strange interpretation in general of the word produced for a motion picture. Well, Your Honor, it's actually both. The collective bargaining agreement, when it uses the word produced, it has a very close nexus to operating a camera. And the Article 9 specifically references producing on — on film. Article 1 specifically references producing on film. And so the use of the word produced in the collective bargaining agreement contemplates operating cameras to put images — Well, it contemplates seeing that a camera is operated, but not necessarily operating it. I mean, usual — I mean, I would have thought, you know, before all this, I had always understood that a producer was somebody who arranged for the movie to be made, provided some financing, and — and hired people to do it, meaning the — the contractor, but not necessarily any actual employees. Well, Your Honor, there's actually two uses of the word produced in the contract. There are the producers, the capital P, Producer, which is the signatory to the agreement. And then Article 3 contemplates that the capital P, Producer, is producing. So I'm looking at — But the verb, one's a noun and one's a verb, right? Correct. So we're talking about the verb today. I'm talking about the verb today. And — You're talking about just as a matter of general practice? Is that what you're talking about? It's — As to what a producer does or is supposed to do? Well, it's — in fact, the AFM admitted, Your Honor, that produced means shoot. It means principal photography. Well, produced means to see that it is shot in part. I mean, there — but there's other parts of producing. It's hiring — it's seeing that — that there's a set and seeing that there's, you know, a whole lot of other things, no? Well, for the purposes of this labor contract, the AFM's person most knowledgeable testified that produce means shoot. Well, for the whole contract or for Article 3? For — for the whole contract. But the battle has been over Article 3. When you say produce, you mean as — have control over the shooting? That's — that's correct, Your Honor. So — In other words, you know, can make the decisions on certain things? Well, the — the Article 3 looks at the location of producing. So we know that producing is a physical act. It can't be an approval, which takes — Not necessarily. I mean, you look at the credits on today's motion pictures. There might be a dozen producers, right? Well, there's the — In fact, I know the Canterbury Motion Pictures had to limit the number of credited producers to three because there were so many, right? And 25 people get up on the stage to get the Best Picture Award. So — so, Your Honor, there are individual producers, but that is not the producer that the collective bargaining agreement is referring to. Well, that's what I'm asking you. That's exactly what I'm asking you. So the collective bargaining agreement contemplates a singular producer. There is no use in the collective bargaining agreement of coproducer or coproduction. It contemplates a singular producer. Well, that's contemplating a world that doesn't exist. I'm sorry? It's contemplating a world that doesn't exist, is what you're saying. It's just completely adequate. No, the — the — the word producer is used in many different ways in the industry and in the common parlance. There are people like Mary Parent, who is called a producer. She's an individual that in this case was contracted by Skodom Films to oversee things. So you're basically saying under this agreement, there's no coproduction. You can't have more than one producer. Under this agreement, you can have only one producer. And there's no — and, again, the best — Where are you getting that from? Well, the best proof of that is the coproducer or the plural producers is never used in this agreement. So the Court would have to rewrite the agreement. But when it says all — take Article III, all theatrical motion pictures produced by the producer, that doesn't say anything about the fact that there can't be another producer. It doesn't say that there could be another producer. Right. That's right. But usually, if you say it's produced by the producer, okay. And then there was — and somebody else, too. What's wrong with that? Well, Your Honor, it's our position that if the contract doesn't contemplate more than one producer, then the plain terms suggest there's one producer. Furthermore, the plain terms suggest that the producing, the verb producing, means to operate the cameras, to put images on film. I must say that I think those are both exceedingly weak arguments. Although I don't think your position — I don't think the other side's position is slam-dunk. The way you're going at this seems not to be there. Well, there's another really important reason, Your Honor, why we believe that the matter that we're arguing to the Court. And that goes to the affirmative defense. So the essence, frankly, of all of our arguments is that Paramount did not control any aspect of this production. But isn't that going to be a question of fact? And then you've got some really tough evidentiary rulings, right? We don't believe, Your Honor, that it is a question of fact, because the AFM admits — it admits that Skodom Films selected the composer. Yes, Paramount had the right to approve, but that's very different from controlling the decision. It didn't have the right to select the composer. It had the right to approve of Skodom Films' selection. So, therefore, if they had — if Skodom Films — if they knew that Skodom Films was going to be scoring outside the United States, they should have said, no, we disapprove or could have said, we want no because we have an obligation to have it scored in the United States. Could it have done that? No, Your Honor, because there's no evidence that Paramount could have exercised any such control over Skodom Films' decision. Why not say suspect to the evidentiary rulings, right? When you say there's no evidence, there's some, as I've indicated, I think these are pretty tough evidentiary rulings for you to defend, aren't they? Oh, I don't believe so, Your Honor. There was an expert who's never been — But explain to me why the authority in the contract to approve — I assumed it to approve includes disapprove. No? Presumably, you can — And therefore, why isn't it a fair inference that what I said is the case? They could have said we disapprove because they're not going to produce — they're not going to score in the United States. We disapprove. Well, Your Honor, the contract contemplates that Paramount could approve or disapprove the selection of the composer, but that's a far stretch from approving or disapproving of a decision to do the scoring work outside the United States. I'm sorry. I don't understand that. So the composer, John Paisano, without any oversight or direction or input from Paramount, on his own, contracted with musicians and made the decision to score outside of the United States. Paramount had no supervision of Mr. Paisano. It had no contract with Mr. Paisano. It could have, under their contract with Skodan Films. It could have. It could have said we don't want this guy because he hasn't committed to a score in the United States. Why not? Or at least why isn't that an inference that a fact finder couldn't make? Well, there's no evidence. Well, first of all, they did approve him, and there's no evidence that they gave any input at all about his selection. Hypothetically, could they have said we don't want Mr. Paisano? Yes. But could they have directed that the scoring take place in the United States? No. No, but they could have directed that they only hire somebody who was committed to scoring in the United States. Your Honor, there's just no evidence that that was a possibility. There's nothing other than the approval over the composer. There's no evidence that Paramount had any control at all over the scoring process. And that's the 80 problem that the AFM confronts, because under 8e, if Paramount had no control over assignment of the work, then as a matter of law, the hot cargo provision applies and the contract was unlawful. But if you make a commitment to have control over the work and then give it away, what happens then? Well, Your Honor, this was never Paramount's work to give away. The facts and here the credulity But I'm asking you a legal question now. If Paramount had been, had started this project and had the rights completely for the project and had control over the scoring work, then I will agree, Your Honor, there was no 80 issue. But those aren't the facts. Here, the facts that we have to address are, one, that Paramount was brought in late in the project. It was an investor. Well, not well before anything actually happened, though. Well, there was a screenplay. There had already been some labor decisions made. The you know, there had been. What do you mean by labor decisions? Do you mean hiring of cast or someone? I'm sorry? What do you mean by labor decisions? So some of the key hiring decisions, like the director, those decisions had already been made. If you're if your interpretation of the CBA is correct and Paramount is not the producer, then the CBA doesn't apply at all, does it? That's correct. There's no evidence that any other producer, anybody else, you know, was a member of the of the group that signed the CBA, right? That is absolutely correct, Your Honor. It's just what we'll worry about, which this paragraph or that paragraph apply. The entire agreement is out. That's correct. At the end of the day, Your Honor, if Paramount did not produce this movie and we submit it did not, then the AFM collective bargaining agreement has no application and there's no breach. This is a breach of contract action. Is this movie out yet? I'm sorry? Is this movie out yet? It came out in October, Your Honor. And what does it say on it about Paramount? Paramount, you know, actually I believe the company Pure Flix ended up becoming the one of the principal distributors. There's no evidence in the record. I'm just telling you what I've what I've read, Your Honor. But Pure Flix had been involved even before Paramount and had some discussions with Moorman and others on the production about possibly coming in, and I believe they ultimately were involved in the distribution. So are you going to speak to the evidentiary issues? I'm happy to, Your Honor. So there was a declaration that had been presented by the AFM by an individual who had no foundation for basically anything he said. But most importantly, it was an expert report, and it wasn't a sworn expert report. And when the AFM sought to cure the defect when it submitted this expert report, the declaration that was submitted simply said, if I were to testify, I would testify consistent with my expert report. What's wrong with that? Well, it doesn't say that any of the facts stated in the expert report were sworn and made and are true as a matter of penalty of perjury. It says, I would testify consistent. What does that mean, consistent with that? Do you have any authority for this? Your Honor, we've cited all of the cases that we could find on expert declarations, and each of the cases that we've cited discusses how the actual statements in the expert report must themselves – this is key – must themselves be under penalty of perjury. Here, there isn't actual statements made under penalty of perjury. There's just a generalized, vague statement that – That the expert would swear accordingly if called to testify. Well, consistent, yes, Your Honor. I believe that's – I'm absolutely at a loss to understand your argument on this. How is this a meaningful distinction? Well, you have a very lengthy expert report, Your Honor, and for a witness to say – to not say that's true, that's true, and that's true, but to instead say, oh, yes, I would testify consistent with what I put in my report, that is not appropriate testimony under penalty of perjury. As opposed to what you think he ought to have done, that the first time around he should have said, I test all this under the penalty of perjury. Yes, Your Honor. And that's different from attaching a declaration after the fact that says if I called to testify, I would testify consistently with this report under penalty of perjury. You know what, Your Honor? If the AFM had submitted from this expert a declaration that says I've read the report and I testify that everything in that – If he called upon to read the report, isn't he the author of the report? Well, yes, but I want what we would need, and I believe what the Court would need, is an attestation that – Let me ask you something. If he was called upon to testify at trial, he would have to testify – he would have to take an oath, right? He would have. Right. If called to testify at trial, I would testify consistent with the conclusions and opinions contained. Isn't that – isn't that saying that I would swear to the truth of it? Your Honor, I believe there's a difference between saying I would testify to everything in my report and saying I would testify consistent. I would testify under oath to everything. I mean, it's necessarily implicit that he would testify under oath to everything in the conclusions and opinions contained in the April 12th report, right? The buzzword, Your Honor, is consistent. What does that mean? I think we understand your argument, and I appreciate your response, and now I think we're just belaboring the point. Because I'm hoping you're going to respond to the Toth email as well. Yes, Your Honor. Is it Toth, Toth? I don't know. Well, the key difference is when you testify under oath, you're submitting yourself to the possibility of perjury, right? That's correct. I mean, you know, for a material variant. And as you said, it might be difficult to determine what variants are consistent with, you know, some other phraseology. It's not – it's not exactly the same, at least, is it? We believe, Your Honor, that it's not the same. To specifically attest to the facts is different in both kind and substance to saying I would be consistent. Do you want to talk about the Toth email or just wait? Yes, Your Honor. The Toth email has two layers of hearsay. First of all, the — Isn't the first layer a party opponent? The Toth email isn't part of any particular – of any particular factual relevance. The – Your Honor's looking quizzical. You think this was excludable on relevance grounds? Yes. It doesn't prove or disprove that there was control over scoring. But just a minute. It wasn't excluded on relevance grounds. It should have been if it wasn't. But it wasn't, right? It was excluded on hearsay grounds, Your Honor. Right. So why is it hearsay? It's hearsay because the email purports to show what somebody said to the person who wrote the email. And the somebody who said – No, but what he said wasn't – wasn't inquiry. And it testifies that he said it. And its relevance, if there is relevance, isn't – is – It's not the truth of the matter, is there? It's an assumption about why would he be asking this question if the person he was talking to didn't have any authority. But it's not a statement of the truth of anything. What's it – what is the statement of the truth of? Well, Your Honor, I believe that AFM was offering this piece of evidence to prove the truth that Paramount had control over the scoring process. And the – But the statement isn't a statement about that. It's a state – it's a question, right? It's – I'm – that somebody asked a question. And it's not a – so it's not hearsay as to the statement that was made. Your Honor, and I can – I can read – It's that he made the statement. He said X. Please call it out. The words, the following words. Your Honor, I'm trying to find the exact statement. The statement that was made – and so, first of all, let me – let me, if I may point out, that this is an email to somebody who we really don't even know, to Linda Springer, and – wherein this person, Toth, recounted a telephone call that she had with somebody named Neil Cohan. Now, Neil Cohan is not a representative of Paramount. He can't bind the company in any way. And the only possible relevance of the statement that Cohan made – Well, he was an agent of the compelsor, as I understand it. That's my understanding, Your Honor. Okay. And he's asking a question. And she's saying he asked this question. So the question itself, Your Honor, would be hearsay unless it had some independent significance. How is the question hearsay? I don't understand it. A question, by definition, isn't a statement of the truth of anything. Well, Your Honor, it's an out-of-court statement. It's either being offered to – for the truth, or it's being offered because it has independent significance. It has no – Being offered to say that he said it. These are the words he said. That's not hearsay, right? Well, it has no independent significance, Your Honor. Its supposed significance is he said these words, which demonstrates that he had some understating that there was some relationship between the compelsor and Paramount. What does that prove, Your Honor? Because those words were – well, maybe it's not true. Maybe it's lousy evidence. But I don't see why it's hearsay. Okay. So, Your Honor, even if it's – even if the AFM could get over the double hearsay problem, it's still not relevant. And most importantly, even if it's relevant, it doesn't create an issue of fact about whether Paramount had control over scoring. The AFM in the separate statement, in their opposition to the separate statement, admitted – admitted that Scodom contracted Paisano, and Paisano made all of the decisions about hiring. I mean, the implication here is he didn't because he was asking a question to Paramount. Why was he asking Paramount if he thought he had complete control? Except, Your Honor, the AFM's already admitted these facts. It could give the Court the cite. It's in the separate statement. And I believe it's – it's facts number 53 and 54, where the AFM specifically admitted that the decisions over scoring were made by Scodom Films. The cite, Your Honor – Okay. You are – well, you're not quite over your time because I gave you five extra minutes, so okay. The – the cites, Your Honor, are S.E.R. 455 to 458, which is the consolidated separate statement. The AFM creates a quote dispute but doesn't actually, if you read the response, doesn't actually dispute the facts, which are that Scodom Films made the decisions about the composer. The composer made all the decisions about the musicians and the contractors, and the contractors supervised the conditions of employment for the musicians, set the conditions of employment, and Paramount had no control. Unless the Court has to say otherwise, I don't think I have any more questions. Okay. Now your time is up. Okay. Okay. Thank you very much. Thank you for your argument. Thank you, Your Honors. Just to address a couple of issues quickly. First, with respect to the term produce, even the collective bargaining agreement uses the term produce. In fact, in the very article that my friend cites, to mean more than just film. It says in Article 9, which is ER 64, that the agree not to produce, distribute, or make use of a 16 millimeter film with music soundtrack produced within the United States. The term produce is not in the contract defined, and certainly the employment of the cast and crew is not defined in the contract. Defendant's own 30B6 witness included a whole bunch of tasks that are part of production, including monitoring the production, budgeting the production, doing casting that has nothing to do with employing the cast and the crew. Now, with respect to the evidence of the AFM testimony on this, the AFM 30B6 witness specifically stated that it was, and this is at ER 41, I believe, that when he's talking about shooting the motion picture for purposes of determining where the motion picture was produced, it does not mean who operates the camera, and it's not understood as such by the parties. Similarly, Mr. George Cohen, who is the chief negotiator, indicated that when he was talking about making, shooting the motion picture for purposes of produced in Article 3, he was trying to, it was all in the context of where the motion picture was shot. Now with respect to Paramount's control, there's, beyond what I alluded to in my opening remarks, Paramount did a whole bunch of other things that provide an inference that it could control the assignment of work. For example, it assigned its own employee to control all the post-production at its own expense. There's nothing in the contract with Skodan that allowed it to do that. It just did it, and Skodan was happy about it. Now with respect to the music specifically, you start off with determining whether or not the control or the ability to assign the work, the courts look at, and this is the Sears case out of the D.C. Circuit, looked to whether or not the employer had an interest in whether or not the work was done under the contract or not, and here the interest that the work not be done under the AFM agreement was entirely the Paramount's interest, because Paramount owned all of the music rights under the contract, and under the AFM collective bargaining agreement, the reuse of music that scored under the contract requires additional payments, which would be entirely on Paramount. So it's in its interest that the music not be scored, and it's in its interest to offshore the music. You, by the way, you agree with your opponent that under this agreement, a motion picture can only have one producer? No, Your Honor, I don't. I think, and I don't think that that's been the standard in the industry for decades. Indeed, Paramount co-produces motion pictures with other signatories all the time, but that's not what the district court found either, and, in fact, I think in the opposition brief, the answering brief, they admit that there could be situations in which there was more than one producer and there were co-producers. The co-finance agreement itself identifies Paramount as a co-producer in at least one section. Okay. Your time is up. Thank you very much. Thank you. Thank both of you for your argument. It's an interesting case, and we will, in the case of American Federation Musicians v. Paramount, pictures is submitted, and we are in recess. Thank you.
judges: Tashima, Berzon, Christen